## No. 12,696.

### Roberts et al. *v.* Dietz.
#### (298 Pac. 1062)

Decided April 27, 1931.

Mr. Fancher Sarchet, for plaintiffs in error.

Messrs. Stow & Stover, Mr. Herbert A. Alpert, for defendant in error.

*In Department.*

Mr. Justice Butler delivered the opinion of the court.

Harry Dietz recovered a judgment for $3,625 against Esther E. Roberts for damages sustained by him in an automobile collision. He thereupon sued to set aside, as fraudulent, a trust deed given by Esther E. Roberts to secure the payment of three promissory notes given by Esther and her husband, Charles; one for $875, payable to the order of the Poudre Valley National Bank and endorsed by it to the Linden Investment Company, an agent or trustee for the bank; one for $1,352, payable to the order of George Roberts, and one for $1,326, payable to the order of Ernest Roberts. The court held that the conveyance was given to hinder, delay and defraud Dietz, and was void "as against the execution or enforcement of the judgment" obtained by him. We reversed the judgment and remanded the cause for a new trial as to George Roberts and Ernest Roberts, and directed the trial court to render judgment in favor of the Linden Investment Company. *Roberts v. Dietz,* 86 Colo. 595, 284 Pac. 337.

George and Ernest are brothers-in-law of Esther; hence, in the circumstances disclosed by the record, the burden of proving the honesty of the transaction and their good faith rested upon them. This they offered to prove at the first trial, but the court rejected the offer, and decided the case against them because it took the erroneous view that the case was governed by the decision in *Hafelfinger v. Perry,* 52 Colo. 444, 121 Pac. 1021, and that the good or bad faith of the defendants was immaterial. Upon the second trial such evidence was admitted, but the court again rendered judgment against George and Ernest, which judgment they seek to reverse.

The first trial was partly upon a stipulation as to facts; the second was a trial de novo upon evidence introduced by both parties, it being agreed that the stipulation as to facts made at the first trial should be disregarded. The trial court found that George and Ernest did not sustain by proof the burden cast upon them by reason of their relationship to Esther. Is the record such that we would be justified in setting aside that finding? We think not.

There was testimony to the effect that in 1910 George and Ernest advanced money to Charles to pay a judgment against him; that they allowed the matter to drift until after Dietz sued Charles for damages for personal injuries sustained in an automobile accident, when, on September 1, 1928, George was given a promissory note for the balance claimed to be owing him by Charles; that as Esther had property standing in her name and Charles had none standing in his name, she signed the note with him. The evidence also shows that thereafter Dietz dismissed his action against Charles, and on October 16, 1928, sued Esther on the same cause of action; and that on January 1, 1929, Ernest was given a promissory note, signed by Charles and Esther, for the balance claimed to be owing him by Charles. The verdict in the Dietz case was rendered on April 30, 1929, and immediately thereafter Esther disposed of some of the property standing in her name and encumbered the rest. On May 1 she executed the trust deed in suit; on May 7 she deeded some land in Larimer county; on May 9 she homesteaded other property; and on May 11 she executed a chattel mortgage on a Graham truck. These transactions rendered her insolvent. On May 13 judgment was rendered in the Dietz case, but neither at that time nor at any time thereafter did Esther have any property standing in her name subject to execution. A tenant in the Roberts house (the property later included in the trust deed in suit) testified that between the last of April and May 7, Esther and Charles stated that they would like to

occupy a part of the house in order to homestead it; that a few days later they wanted him to buy the house, saying that they had to do something right away on account of the Dietz case.

The original indebtedness was the husband's, not Esther's; Esther was not liable thereon.. Ever since their marriage the property and the business—there was a business—were in her name. She testified that from that time on whatever they had was all kept in her name; that that was not done so nobody else could get hold of it, because they always paid their debts. Not until after the Dietz litigation was commenced did Esther give her notes for her husband's debt to his brothers. They watched the progress of the litigation, and immediately upon the rendition of the verdict Esther disposed of and encumbered, in the manner already described, the property standing in her name. She considered the Dietz verdict unjust. She testified that whatever her husband did was with her authority; that they generally conferred together, and what one thought was right the other thought was right. A witness testified that on numerous occasions Charles stated that he wanted to beat the Dietz judgment. True, the same witness, as well as Esther herself, said that Esther never agreed to do anything except for the protection of bona fide creditors, but she admitted on the witness stand that she did not want to pay Harry Dietz, but knew that she would have to pay him "some time."

Ernest testified that with the Dietz suit coming on it looked like it would be bad for both Charles and Esther, so he decided to get a note; that before that he had not insisted on any note; that later Charles telephoned him that Dietz had obtained a verdict and to bring the notes down to the bank so that they could be included in the trust deed; that George does not know "whether they were doing it to avoid payment of the judgment or anything;" that he thought it was being done to secure the indebtedness; that. he made no inquiries; that if the

notes were incorporated in the trust deed, "they put them in, I didn't;" that he told his brother George that the verdict had been rendered; that he had said to Judge Stover that he, Ernest, did not know what became of the trust deed, or did not know what would become of it. George denied that Ernest said anything to him about the verdict. He said that when the notes were asked for he knew "it was something about the security for them;" that he knew of the pendency of the suit, but did not then know of the verdict. But he also testified that the reason they were getting the security was on account of the verdict—"I suppose it looked that way to me." The notes were turned over by Ernest and the trust deed was made and Esther signed it. She testified that Charles always did most of the business, but everything belonged to her, "and of course I had to sign it when it was ready. There was nothing put before me that wasn't right for me to sign. I knew what was going on most of the time."

 The trial court is the judge, not only of the credibility of witnesses and of the weight of the evidence, but of the inferences properly deducible from the facts and circumstances as proved. *Gwynn v. Butler,* 17 Colo. 114, 28 Pac. 466; *Reahard v. Miller,* 66 Colo. 80, 179 Pac. 157; *McDermott v. Lingquist,* 66 Colo. 88, 89, 179 Pac. 147. On review, the record is viewed in the light most favorable to the party successful in the trial court, and every inference fairly deducible from the evidence is drawn in favor of the judgment. *Carper v. Frost Oil Co.,* 72 Colo. 345, 211 Pac. 370. Considering the foregoing facts, and the close relationship and intimate association of Esther, her husband and his brothers, we cannot say that the findings of the trial court were not supported by the evidence and the inferences reasonably to be drawn therefrom.

The judgment is affirmed.

Mr. Chief Justice Adams, Mr. Justice Moore, and Mr. Justice Burke concur.